**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| TARKETT USA, INC. ) | |
| 30000 Aurora Road ) | CASE NO. |
| Solon, OH 44139, ) | |
| ) | JUDGE |
| Plaintiff, ) | |
| ) | |
| v. ) | **COMPLAINT** |
| ) | |
| H.B. FULLER COMPANY ) | **(JURY DEMAND ENDORSED** |
| 1200 Willow Lake Blvd ) | **HEREON)** |
| St. Paul, MN 55110 ) | |
| ) | |
| ) | |
| Defendant. ) | |

Plaintiff, Tarkett USA, Inc. ("Tarkett"), for its Complaint against Defendant, H.B. Fuller

Company ("H.B. Fuller"), alleges as set forth below.

**NATURE OF THE CASE**

1.      This is an action concerning a deception perpetrated by a multinational adhesives

manufacturer, H.B. Fuller, on a longtime and loyal customer.

2.      Tarkett is a leading manufacturer of commercial flooring products based in Solon,

Ohio.  For over a decade, Tarkett has purchased a particular adhesive product from H.B. Fuller

(the "925 Adhesive") for use in connection with Tarkett's premium homogeneous vinyl sheet

flooring products.  Consequently, at all relevant times, H.B. Fuller thoroughly understood

Tarkett's business, including the type of adhesive that Tarkett's vinyl flooring products required

when using a heat weld installation method, as well as Tarkett's customers and the damage that

could result from an ineffective adhesive.

3.      When H.B. Fuller's supply chain shortages threatened to cause Tarkett to move its

business to a different manufacturer, H.B. Fuller recommended replacing the 925 Adhesive with a

1

reformulated version.  Tarkett inquired as to whether H.B. Fuller had tested the new formulation on Tarkett's flooring.  Intent on retaining Tarkett as a customer and knowing that Tarkett would rely on its representations given its expertise and the parties' longstanding relationship, H.B. Fuller responded by sending Tarkett test results indicating H.B. Fuller had tested the revised formulation for compatibility with Tarkett's vinyl flooring products.

4.      Believing H.B. Fuller's representations to be truthful, Tarkett agreed to use the reformulated 925 Adhesive as a substitute for the 925 Adhesive and proceeded to use it in a range of projects.

5.      Tarkett's trust in H.B. Fuller turned out to be badly misplaced.  As H.B. Fuller has ***now conceded***, it did not test the new version of the 925 Adhesive for compatibility with Tarkett's vinyl flooring products.  Had it done that testing, H.B. Fuller would have discovered the new adhesive had inferior bond strength that rendered it unsuitable as a replacement.

6.      The reformulated adhesive was defective and caused almost 50 failed flooring installations.  As a result, Tarkett suffered more than $3.4 million dollars in damages and its reputation within the industry was tarnished.

7.      Unfortunately, H.B. Fuller's misconduct did not stop after defrauding Tarkett. H.B. Fuller recently sold its North America flooring adhesive business, and it therefore no longer has a financial incentive to retain Tarkett as a customer.  Having been left with the business's historic liabilities as part of the transaction, H.B. Fuller has declined on various pretextual bases to honor its obligations to Tarkett.  Indeed, H.B. Fuller has gone so far as to engage in victim-blaming by claiming Tarkett should have discovered for itself the reformulated 925 Adhesive is defective notwithstanding H.B. Fuller's expertise, H.B. Fuller's unique knowledge of how the

reformulated 925 Adhesive was designed and manufactured, and H.B. Fuller's representations to Tarkett about the suitability and testing of the new version of the 925 Adhesive.

8.      Tarkett brings this action to recover costs related to replacement and repair of the failed flooring installations, and damages stemming from harm to Tarkett's business reputation.

## PARTIES

9.      Tarkett is a Delaware corporation with its principal place of business in Solon, Ohio.  Tarkett provides flooring solutions for commercial and residential spaces, and it is part of the Tarkett Group, which is a world leader in flooring and sports surface.

10.      H.B. Fuller is a publicly traded adhesives manufacturer incorporated in Minnesota, with its principal place of business and global headquarters in St. Paul, Minnesota.

11.      In December 2024, Pacific Avenue Capital Partners bought H.B. Fuller's North American flooring/adhesive business and rebranded it under the name TEC Specialty Products. Upon information and belief, H.B. Fuller retained responsibility for the legal claims at issue in this dispute.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because Tarkett and H.B. Fuller are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13.      This Court has personal jurisdiction over H.B. Fuller because during the relevant period, H.B. Fuller transacted business in Ohio, had substantial contacts with Ohio, directed its conduct at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in Ohio.

14.     Tarkett's claims arise out of or relate to H.B. Fuller's contacts with Ohio, and H.B. Fuller actively sought to serve markets in Ohio and did so.

15.     Venue is proper in this District because a substantial portion of the events giving rise to Tarkett's claims described herein occurred in this District.  Specifically, Tarkett and H.B. Fuller conducted business in this District and the adhesives at issue were delivered to a Tarkett distribution center in this District.

## FACTUAL ALLEGATIONS

### A.  Background as to Tarkett and H.B. Fuller's Business Relationship

16.     Tarkett is a supplier of commercial and residential flooring solutions.  Among other products, Tarkett supplies homogeneous vinyl sheet flooring, which is made of a single layer and has a uniform color or pattern throughout.  It is typically more durable than heterogeneous vinyl sheet flooring, which is constructed using multiple layers but is less expensive.

17.     H.B. Fuller is a leading global adhesives manufacturer with a market capitalization of approximately $3.2 billion and 2024 revenues of $3.6 billion.  H.B. Fuller also holds itself out as possessing "comprehensive technical expertise" related to adhesives.  According to its public pronouncements, "[H.B. Fuller] partner[s] with our customers to respond to ever-changing market demands, develop and produce unique breakthrough adhesive technologies, and most importantly add value to our customers."

18.     Tarkett has purchased the 925 Adhesive from H.B. Fuller for over a decade for use in projects involving its vinyl sheet flooring products.  Effective adhesive is a critical component of the installation process for vinyl sheet flooring.

19.     As a result of the parties' longstanding relationship, H.B. Fuller clearly understood Tarkett's business needs and customer base, as well as the consequences of a failed installation.  As an adhesives manufacturer, H.B. Fuller had specialized knowledge about its products' chemical composition, manufacturing process, and performance characteristics, and H.B. Fuller specifically understood that Tarkett's vinyl sheet flooring products are typically installed with a heat weld.

20.     Given the length of the parties' business relationship, Tarkett trusted that H.B. Fuller would not deceive Tarkett about the efficacy of its products and would honor its obligations to Tarkett.

**B.  H.B. Fuller Recommends that Tarkett Purchase the Reformulated 925 Adhesive**

21.     In September 2021, Tarkett sent H.B. Fuller a purchase order for 480 units of 925 Adhesive at a price of $33,484.80 (the "PO").

22.     The PO linked to and incorporated Tarkett's General Conditions of Purchase ("GCP"), which include broad guarantees and warranties.  A true and correct copy of the PO and GCP are attached hereto as Exhibit A.

23.     At the time Tarkett sent H.B. Fuller the PO, however, delivery of the 925 Adhesive was significantly delayed.  H.B. Fuller had also failed to explain the reason for the delay, which was causing significant customer problems for Tarkett.

24.     The parties had a meeting on December 13, 2021, to address H.B. Fuller's inability to supply the 925 Adhesive the ("December 2021 Meeting"), which was causing significant problems for Tarkett.  As a representative of Tarkett put it at the outset of the Meeting: "If we aren't selling adhesives, we are not selling flooring."

25.     The purpose of the December 2021 Meeting for H.B. Fuller was to avoid losing Tarkett as a customer.  To that end, H.B. Fuller acknowledged the difficulties that it had caused for Tarkett, and it explained that it had developed a solution to its supply issues in the form of a reformulated adhesive.

26.     According to representatives of H.B. Fuller, it had developed a version of the 925 Adhesive that was based on a different plastic polymer but that was just as effective as the traditional 925 Adhesive (the "Reformulated 925 Adhesive").  Specifically, H.B. Fuller represented that (1) the "new polymer should be functionally the same" as the old polymer, (2) the performance of the Reformulated 925 Adhesive "should be very similar" to the 925 Adhesive, and (3) it already had existing products using the new polymer that "work very well."

27.     Testing was also discussed during this meeting, and the parties agreed that the Reformulated 925 Adhesive needed to be tested to confirm it was suitable for Tarkett's products. H.B. Fuller specifically stated that it needed approximately three weeks to perform this testing, which would include laboratory testing.  As for Tarkett, it volunteered to meet with H.B. Fuller to support the testing that H.B. Fuller would be carrying out.

28.     Finally, the parties discussed the importance of transparency.  Tarkett noted that H.B. Fuller had not been forthcoming about the supply issues with the 925 Adhesive.  Tarkett noted that it needed H.B. Fuller to openly share information, both good news and bad news, going forward.  For its part, H.B. Fuller agreed that it would share such information going forward, that it would schedule team meetings to apprise Tarkett of future developments related to the Reformulated 925 Adhesive, and that it would generally improve its customer service.

29.     Given H.B. Fuller's representations about the Reformulated 925 Adhesive, Tarkett reasonably believed that the new version would be suitable for its vinyl sheet flooring

products, and that H.B. Fuller would be completing a full battery of testing to ensure that was the case.  Indeed, given the statements representatives of H.B. Fuller had made about transparency and customer service, Tarkett reasonably understood that H.B. Fuller would inform it of any material developments related to testing the Reformulated 925 Adhesive.

30.     On or around December 22, 2021, H.B. Fuller sent Tarkett a single pail of a trial version of the Reformulated 925 Adhesive.  Given the small size of the sample, it was only suitable for a limited amount of physical characteristic and field testing.

31.     On that same day, Tarkett sent an email to H.B. Fuller noting that it had received the sample and was using it to conduct field testing. Tarkett also requested that H.B. Fuller provide it with laboratory testing to support the change: "To complete review of the change – Has HB Fuller prepared a comparison report using Tarkett Flooring products?  Can you send this?"

32.     The results of that testing were crucial for Tarkett. For example, the Tarkett Systems Development Manager that conducted the physical characteristics and field testing on H.B. Fuller's sample noted the following in an internal email: "Has Fuller completed lab testing with our products? . . .  It seems like a simple change, but a minor change to a Rollsmart substitute resulted in complete bond failure to multiple Tarkett flooring products.  I want to make sure they've done their homework, provide a report, and recommend/warrant the change."

33.     On January 6, 2022, H.B. Fuller sent Tarkett the lab testing that the latter had been seeking.  The testing showed virtually no differences in performance between the Reformulated 925 Adhesive and the 925 Adhesive.

34.     H.B. Fuller knew that sending Tarkett these results would lead Tarkett to believe that H.B. Fuller had run appropriate tests on Tarkett's vinyl flooring products or suitable

substitutes.  H.B. Fuller provided the summary of test results to Tarkett with the intent and

expectation that Tarkett would rely on it and rely on H.B. Fuller's expertise in adhesive

technology.  As discussed more fully below, these test results were not what Tarkett reasonably

understood them to be.  In fact, H.B. Fuller did not test the Reformulated 925 Adhesive on

Tarkett's vinyl sheet flooring products.

35.     Relying on H.B. Fuller's representations and the laboratory testing that it sent,

Tarkett agreed to purchase the Reformulated 925 Adhesive as a substitute for the 925 Adhesive

in the September 2021 PO.

36.     H.B. Fuller then issued invoices and shipped the Reformulated 925 Adhesive,

commensurate with the quantity and delivery address specified in the PO.

**C.  Discovery that the Reformulated 925 Adhesive was Defective**

37.     In November 2022, Tarkett received a warranty claim that vinyl sheet flooring

that had been installed using the Reformulated 925 Adhesive was separating at the heat welded

seams.

38.     In 2023 and 2024, the number of warranty claims received by Tarkett rose

sharply, with the common denominator being the use of H.B. Fuller's Reformulated 925

Adhesive.  Moreover, on one job site where the Reformulated 925 Adhesive was used in one area

and another adhesive in a different area, only the Reformulated 925 Adhesive section showed

separation from the vinyl.

39.     While these developments concerned Tarkett, it still did not know and could not

know that it had been deceived by H.B. Fuller.  Tarkett sent samples of vinyl sheet flooring to

H.B. Fuller and asked them to be laboratory tested using both the Reformulated 925 Adhesive

and the 925 Adhesive.

40.     On or about July 10, 2023, Tarkett received the results from H.B. Fuller.  The results were alarming for several reasons.

41.     First, the results were markedly different from what H.B. Fuller had previously sent to Tarkett in that they showed markedly lower bond strength in the Reformulated 925 Adhesive. In fact, H.B. Fuller noted "[a]s for the comparison of the current [Reformulated 925 Adhesive] vs old formulation we were a bit surprised on the shear difference." H.B. Fuller's "surprise" was noteworthy because it should not have been surprised by the results if H.B. Fuller had properly tested the Reformulated 925 Adhesive before recommending it to Tarkett.

42.     Second, in their notes on the testing, H.B. Fuller stated that "[w]hen qualifying the current formulation" with three Tarkett products, certain test results "demonstrated shear strength losses."  H.B. Fuller had never previously revealed that it had tested those products and that the results had shown a loss of shear strength in the Reformulated 925 Adhesive.  In other words, H.B. Fuller was treating Tarkett as having received results that had never been sent.

43.     Third, H.B. Fuller also stated in their notes "[a]re there Target Shear Values[]? Can improve shear values to[] meet Tarkett collections performance needs."  This question was particularly disturbing because as the adhesive manufacturer, H.B. Fuller should have had a target shear strength value for the Reformulated 925 Adhesive before recommending it to Tarkett.  Moreover, the fact that H.B. Fuller was *only now* asking about target shear strength for Tarkett's products suggested that the Reformulated 925 Adhesive had not been properly evaluated by H.B. Fuller.

44.     Following Tarkett's receipt of this testing, the parties had a call over Teams to discuss the results.  On that call, Derrick Sharpe spilled that H.B. Fuller had neglected to test the Reformulated 925 Adhesive with Tarkett's flooring.  This was an admission that H.B. Fuller had

misled Tarkett into believing the Reformulated 925 Adhesive was a proper replacement product when it had no valid basis for believing that to be the case.

45.    Subsequently, Tarkett discovered a problem with the Reformulated 925 Adhesive that went beyond its inferior strength. While performing repairs on the vinyl sheet installed with the Reformulated 925 Adhesive, Tarkett came to learn that the new formulation is heat sensitive such that when seams are heat welded, the Reformulated 925 Adhesive melts into the seam inhibiting fusion between the flooring and the weld rod. For this reason, vinyl sheet installed with the Reformulated 925 Adhesive cannot be repaired using a heat weld. This significantly increased the damages from the defective Reformulated 925 Adhesive because flooring installed with it had to be removed and reinstalled.

### D.  The Applicable Warranty

46.    Tarkett's GCP, which was linked to and incorporated in the PO that Tarkett sent to H.B. Fuller prior to receiving the Reformulated 925 Adhesive, provides that the supplier, H.B. Fuller, has a duty to advise Tarkett "as to the adequacy of the Goods and/or Services regarding the Buyer's objectives."

47.    Pursuant to the Supplier's Obligations, Warranty and Guarantee section of the GCP, H.B. Fuller also "bears an obligation of result and bears in that regard the entire responsibility for the Goods and Services, their conception, their manufacturing process, the technical choices to implement for their performance and their adequacy to the usage for which they are intended."

48.    Such section of Tarkett's GCP also states:

> The Supplier warrants that the Goods and Services delivered will be:
> • Free from any visible or hidden defect, including but not limited to, defect in design, materials, manufacturing, and workmanship,
> • Fit for the purpose for which they are intended, within the normal conditions of use specified by the Supplier and shall

10

offer the safety reasonably expected of them,
• Compliant with the Contract and all documents defining
the Goods and Services, and more generally, with any legal
and regulatory provision in force including but not limited to
health and safety issues,….
• Comply with all other warranties implied or provided for
by law.

The Supplier shall indemnify the Buyer from any loss, damage,
liability or claim, whatever its nature, suffered by the Buyer and
shall bear all the consequences that may result therefrom for the
Buyer and/or third parties….

49.     These warranties also require that H.B. Fuller be responsible for the full cost of

repair and replacement, "including but not limited to labour, travel and accommodation costs,

and, if applicable, reimburse the Buyer for any liabilities it may incur to third parties as a

consequence thereof."

50.     The first section of the GCP advises H.B. Fuller that the "acceptance of any

Order… hereunder shall constitute unconditional and unqualified acceptance by the Supplier [of

the PO and GCP] …as part of the contract between the parties. Any and all terms and conditions

of the Supplier, whether contained in a quotation or otherwise, shall not apply, even if the Buyer

did not expressly oppose them."

51.     Even though H.B. Fuller had received the PO incorporating Tarkett's warranty

terms, it never provided an applicable warranty of its own before shipping the product to Tarkett.

52.     Specifically, Tarkett requested that H.B. Fuller send a proposed warranty for the

Reformulated 925 Adhesive to evaluate on or about January 17, 2022.

53.     The next day, H.B. Fuller sent Tarkett an email titled "Warranty."  The body of

the email obliquely states "Please see attached. 15 years."  Tarkett responded by acknowledging

receipt of the email.

54.     The attachment was a template for the purpose of providing Tarkett with a rough approximation of what H.B. Fuller was intending to include in a proposed warranty for the Reformulated 925 Adhesive.  That fact is evident on the face of the document.  The attachment is a Limited Warranty for what is described as a "System," that is defined as "TEC Surface Preparation product + Parabond Adhesive product shown above."  There is a list of "TEC Surface Preparation Products" on the left side of the document and "Parabond Flooring Adhesive Products" on the right side that are connected by "*with*" and then a list of periods between 10 and 15 years.  The Reformulated 925 Adhesive is nowhere listed in the document.

55.     The document explicitly limits its scope to "any loss or damage arising from the purchase or use of the Products when installed as a System," which would not include the standalone Reformulated 925 Adhesive.

56.     In short, H.B. Fuller neglected to send Tarkett a proposed warranty to evaluate, and it plainly never obtained Tarkett's agreement on the terms of such a warranty.  It merely provided Tarkett with a warranty for different products with cryptic words that, at best, indicated the document was to be a template for a later warranty document.  For that reason, the operative warranty between the parties is the one set forth in the GCP.

**E.  H.B. Fuller's Failure to Honor its Obligations to Tarkett**

57.     Tarkett first notified H.B. Fuller of claims related to the Reformulated 925 Adhesive in or around July 31, 2023.  The parties had several discussions to address the issue.

58.     On February 16, 2024, Tarkett sent H.B. Fuller a letter memorializing the parties' prior discussions with respect to the Reformulated 925 Adhesive.  The letter specifically noted that Tarkett had received multiple claims related to the failure of the Reformulated 925 Adhesive, which totaled in excess of $200,000.

12

59.     H.B. Fuller responded to this letter on February 23, 2024.  Although the letter contains several inaccurate and self-serving claims, at least, H.B. Fuller acknowledged that it was the party responsible for performing the laboratory testing on the Reformulated 925 Adhesive: "Prior to offering this new formula to Tarkett, H.B. Fuller completed several product lab evaluations and testing, comparing both old and new products, which were shared and discussed in detail with Tarkett." By contrast, Tarkett was merely provided with samples of the Reformulated 925 Adhesive to evaluate.

60.     H.B. Fuller closed the letter by representing that it was committed to working with Tarkett to resolve any issues with the Reformulated 925 Adhesive.

61.     Over the next few months, the parties exchanged additional letters on this subject. Tarkett informed H.B. Fuller that the number of customer claims had dramatically increased.  At that point, H.B. Fuller changed its story and began claiming Tarkett was solely responsible for testing even though H.B. Fuller had designed and manufactured the Reformulated 925 Adhesive, recommended it to Tarkett, and the parties had agreed that H.B. Fuller would perform the laboratory testing to ensure the Reformulated 925 Adhesive was appropriate for Tarkett's flooring products.

62.     While the parties attempted to mediate their dispute, that effort was ultimately unsuccessful.  The Reformulated 925 Adhesive has caused almost 50 failed installations and more than $3.4 million dollars in damages to Tarkett for replacement, repair, and other costs.

63.     Many of the installations were located in hospitals or schools, making a failed installation highly inconvenient for Tarkett's customers.  Consequently, Tarkett has suffered reputational harm and has lost business opportunities because of the defective Reformulated 925 Adhesive and resulting failed installations.

## COUNT I
## Fraudulent Inducement

64.     Tarkett re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

65.     In or around December 2021, H.B. Fuller proposed that Tarkett use the Reformulated 925 Adhesive as a substitute for the 925 Adhesive.

66.     H.B. Fuller knew of the particular purpose for which Tarkett would use the adhesive, namely, heat weld installation of vinyl sheet flooring.

67.     When asked by Tarkett whether it had tested the Reformulated 925 Adhesive on Tarkett's vinyl flooring, H.B. Fuller sent a summary of test results showing that the Reformulated 925 Adhesive performed nearly identically to the 925 Adhesive.

68.     H.B. Fuller's test results left Tarkett with the impression that H.B. Fuller had run the appropriate tests on Tarkett's vinyl.

69.     H.B. Fuller knew that sending Tarkett a summary of test results comparing the Reformulated 925 Adhesive to the 925 Adhesive would lead Tarkett to believe that H.B. Fuller had tested the Reformulated 925 Adhesive on Tarkett's flooring.  Nevertheless, H.B. Fuller failed to inform Tarkett that it had not performed tests on Tarkett's flooring.

70.     By sending Tarkett the summary of test results and failing to disclose that it had not conducted testing on Tarkett's flooring, H.B. Fuller intended to induce Tarkett to purchase the Reformulated 925 Adhesive.

71.     Tarkett assumed H.B. Fuller was the expert on its own formulations and in a superior position to assess the Reformulated 925 Adhesive's fitness for Tarkett's use.

72.     Tarkett agreed to purchase the Reformulated 925 Adhesive as a substitute for the 925 Adhesive in reasonable reliance on H.B. Fuller's representations regarding the fitness of the Reformulated 925 Adhesive for Tarkett's use and on the summary of its test results.

73.     Tarkett not only had the right to rely on H.B. Fuller's representations concerning the Reformulated 925 Adhesive, but was compelled to rely on those representations given H.B. Fuller's superior knowledge and expertise concerning its own products.

74.     As a manufacturer of adhesive products, H.B. Fuller possessed specialized technical knowledge about its adhesives' chemical composition, manufacturing processes, and performance characteristics that was unavailable to Tarkett as a purchaser.

75.     H.B. Fuller held itself out as an expert in adhesive technology, shared the results of purported testing on its products with Tarkett, and recommended an adhesive suitable for Tarkett's particular use.

76.     Given this asymmetry of information and expertise, Tarkett reasonably and necessarily relied on H.B. Fuller's representations concerning the Reformulated 925 Adhesive, its testing results, and fitness for use with Tarkett's flooring.

77.     Only later when confronted by Tarkett did H.B. Fuller admit that it had not tested Tarkett's vinyl flooring, despite understanding the importance of this testing to Tarkett.  Had H.B. Fuller properly tested the Reformulated 925 Adhesive as it had led Tarkett to believe it did, H.B. Fuller would have discovered that the new formula had inferior bond strength that rendered it unsuitable as a replacement.

78.     As a direct and proximate result of its reliance on H.B. Fuller's false and misleading representations and omissions, Tarkett has been damaged and will continue to be

damaged from replacement, repair, and other costs incurred associated with the defective Reformulated 925 Adhesive.

79.     Tarkett has also suffered damage to its reputation and has lost business opportunities due to the nearly 50 failed installations caused by the defective Reformulated 925 Adhesive.

**COUNT II**
**Negligent Misrepresentation**

80.     Tarkett re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

81.     To the extent H.B. Fuller's conduct in Count I does not constitute fraud, such conduct was negligent.

82.     H.B. Fuller failed to exercise reasonable care when it sent Tarkett a summary of test results comparing the Reformulated 925 Adhesive to the 925 Adhesive, because H.B. Fuller knew that doing so would lead Tarkett to believe that H.B. Fuller had tested the Reformulated 925 Adhesive on Tarkett's vinyl flooring.

83.     In agreeing to purchase the Reformulated 925 Adhesive as a substitute for the 925 Adhesive, Tarkett reasonably relied on H.B. Fuller's summary of its test results and its representations regarding the fitness of the Reformulated 925 Adhesive for Tarkett's use.

84.     As a direct and proximate result of its reliance on H.B. Fuller's false and misleading representations, Tarkett has been damaged and will continue to be damaged from replacement, repair, and other costs incurred associated with the defective Reformulated 925 Adhesive.

16

85.     Tarkett has also suffered damage to its reputation and has lost business opportunities due to the nearly 50 failed installations caused by the defective Reformulated 925 Adhesive.

## COUNT III
## Breach of Express Warranty—Tarkett's GCP

86.     Tarkett re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

87.     In September 2021, Tarkett sent H.B. Fuller the PO, which linked to and incorporated Tarkett's GCP.

88.     Pursuant to the Supplier's Obligations, Warranty and Guarantee section of Tarkett's GCP, the Supplier warrants that the Goods and Services delivered will be "[f]ree from any visible or hidden defect, including but not limited to, defect in design, materials, manufacturing, and workmanship," and "[f]it for the purpose for which they are intended, within the normal conditions of use specified by the Supplier and shall offer the safety reasonably expected of them[.]"

89.     Tarkett's GCP further provides that the "Supplier shall indemnify the Buyer from any loss, damage, liability or claim, whatever its nature, suffered by the Buyer and shall bear all the consequences that may result therefrom for the Buyer and/or third parties…."

90.     These warranties also require that H.B. Fuller be responsible for the full cost of repair and replacement, "including but not limited to labour, travel and accommodation costs, and, if applicable, reimburse the Buyer for any liabilities it may incur to third parties as a consequence thereof."

91.     The first section of the GCP advises H.B. Fuller that the "acceptance of any Order… hereunder shall constitute unconditional and unqualified acceptance by the Supplier [of

17

the PO and GCP] …as part of the contract between the parties. Any and all terms and conditions of the Supplier, whether contained in a quotation or otherwise, shall not apply, even if the Buyer did not expressly oppose them."

92.     On January 17, 2022, Tarkett agreed to purchase the Reformulated 925 Adhesive as a substitute for the 925 Adhesive in the September 2021 PO.

93.     H.B. Fuller then issued invoices and shipped the Reformulated 925 Adhesive, thus accepting the terms of the PO.

94.     The GCP was a material component of Tarkett's purchase of the Reformulated 925 Adhesive from H.B. Fuller.  Tarkett would not have purchased the Reformulated 925 Adhesive from H.B. Fuller in the absence of incorporating the GCP into the PO.

95.     Given that Tarkett had been purchasing 925 Adhesive from H.B. Fuller for over a decade, H.B. Fuller specifically understood that Tarkett's vinyl sheet flooring products are typically installed with a heat weld.

96.     The Reformulated 925 Adhesive was not fit for the purpose for which it was intended, and it failed under normal usage.

97.     The Reformulated 925 Adhesive's "shear point," was much lower than the 925 Adhesive formulation, and was more heat sensitive, rendering it ill-suited for heat weld installations.

98.     Tarkett timely and sufficiently notified H.B. Fuller of its warranty claims.

99.     In any case, notice was futile because H.B. Fuller refused to cover the costs associated with the defective Reformulated 925 Adhesive.

100.    The Reformulated 925 Adhesive has caused almost 50 failed installations and more than $3.4 million dollars in damages to Tarkett for replacement, repair, and other costs.

18

101.    Tarkett offered H.B. Fuller the opportunity to visit sites where failed installations had occurred, but H.B. Fuller declined.

102.    Despite extensive communication over several months, and despite being provided an opportunity to gather information, investigate, and perform testing as needed, H.B. Fuller has refused to honor the GCP and has thus breached that warranty.

**COUNT IV**
**Breach of Implied Warranty of Fitness for a Particular Purpose**

103.    Tarkett re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

104.    H.B. Fuller's sale of the Reformulated 925 Adhesive to Tarkett was accompanied by an implied warranty that the Reformulated 925 Adhesive was fit for a particular purpose, which was a material part of the bargain and a material part of Tarkett's decision to purchase the Reformulated 925 Adhesive.

105.    At the time H.B. Fuller suggested Tarkett use the Reformulated 925 Adhesive, H.B. Fuller knew of the particular purpose for which the adhesive would be used, namely, heat weld installation of vinyl sheet flooring.

106.    Given H.B. Fuller's unique knowledge of how the Reformulated 925 Adhesive was designed and manufactured and the parties' longstanding relationship, H.B. Fuller had reason to know that Tarkett was relying on H.B. Fuller's skill or judgment to select an appropriate adhesive for Tarkett's vinyl sheet flooring.

107.    Tarkett relied on H.B. Fuller's skill and judgment when it agreed to purchase the Reformulated 925 Adhesive as a substitute for the 925 Adhesive.

108.    The Reformulated 925 Adhesive was not fit for the purpose for which it was intended, and it failed under normal usage.

19

109.     Despite extensive communication over several months, and despite being provided an opportunity to gather information, investigate, and perform testing as needed, H.B. Fuller has refused to honor its implied warranties to Tarkett and has thus breached those warranties.

110.     Since Tarkett's GCP is the operative warranty, there are no applicable exclusions or disclaimers precluding Tarkett from recovering pursuant to H.B. Fuller's implied warranty of fitness for a particular purpose.

111.     H.B. Fuller has refused to cover the costs associated with the defective Reformulated 925 Adhesive, whether incurred to date or to be incurred in the future.

112.     The defects of the Reformulated 925 Adhesive have injured Tarkett, and will continue to injure Tarkett as replacement, repair, and other costs are incurred by Tarkett associated with the defective Reformulated 925 Adhesive.

### COUNT V
### Breach of Implied Warranty of Merchantability

113.     Tarkett re-alleges and incorporates the foregoing paragraphs as if set forth fully herein.

114.     H.B. Fuller is a merchant and/or seller of adhesives.

115.     Tarkett purchased the Reformulated 925 Adhesive from H.B. Fuller and the sale was accompanied by an implied warranty that the adhesives were merchantable.

116.     This implied warranty was a material part of the bargain and material part of Tarkett's decision to purchase the Reformulated 925 Adhesive.

117.     To be merchantable, goods must (a) pass without objection in the trade under the contract description; and (b) in the case of fungible goods, are of fair average quality within the description; and (c) are fit for the ordinary purposes for which such goods are used; and (d) run,

20

within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and (e) are adequately contained, packaged, and labeled as the agreement may require; and (f) conform to the promises or affirmations of fact made on the container or label if any.

118.    Tarkett used the Reformulated 925 Adhesive for the ordinary purpose for which it is used, namely, to adhere flooring.

119.    The Reformulated 925 Adhesive was not fit for the ordinary purpose of heat weld installation of vinyl sheet flooring and failed under normal usage.

120.    Since Tarkett's GCP is the operative warranty, there are no applicable exclusions or disclaimers precluding Tarkett from recovering pursuant to H.B. Fuller's implied warranty of merchantability.

121.    H.B. Fuller has refused to honor its implied warranties to Tarkett and has thus breached those warranties.

122.    H.B. Fuller has refused to cover the costs associated with the defective Reformulated 925 Adhesive, whether incurred to date or to be incurred in the future.

123.    The defects of the Reformulated 925 Adhesive have injured Tarkett, and will continue to injure Tarkett as replacement, repair, and other costs are incurred by Tarkett associated with the defective Reformulated 925 Adhesive.

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, Tarkett prays this Court for the following relief:

        a.    Monetary damages in an amount to be proven at trial but which in any event exceed $3.4 million;

21

b.    Pre-judgment and post-judgment interest at the maximum rates

permitted by law;

c.    Reasonable costs, expenses, and attorneys' fees;

d.    Punitive damages; and

e.    Such other or further relief that this Court deems just and proper.

Respectfully submitted,

*/s/ Anthony F. Stringer*
Anthony F. Stringer (0071691)
Sage X. Wen (0098975)
**CALFEE, HALTER & GRISWOLD LLP**
The Calfee Building
1405 East Sixth Street
Cleveland, OH 44114 1607
Telephone: (216) 622.8214
Email: astringer@calfee.com
        swen@calfee.com

L. Reid Skibell (*pro hac vice* forthcoming)
Julia L. Gordon (*pro hac vice* forthcoming)
**GLENN AGRE BERGMAN & FUENTES LLP**
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
Email: rskibell@glennagre.com
        jgordon@glennagre.com

*Attorneys for Plaintiff, Tarkett USA, Inc.*

### JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Tarkett demands a trial by jury of all issues triable of right

by jury.

*/s/ Anthony F. Stringer*
Anthony F. Stringer (0071691)

*Attorney for Plaintiff, Tarkett USA, Inc.*

22